1

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF GEORGIA
 2                         SAVANNAH DIVISION


 3
     UNITED STATES OF AMERICA,    )
 4                                )
             Plaintiff,           )
 5                                )
        vs.                       )     CASE NO. 4:20-CR-124-10
 6                                )
     LAMAR HARRIS,                )
 7                                )
             Defendant.           )
 8   --------------------------

 9

10

11

12

13                TRANSCRIPT OF DETENTION HEARING
                BEFORE THE HONORABLE CHRISTOPHER L. RAY
14                    United States Courthouse
                          125 Bull Street
15                        Savannah, GA
                        March 11, 2021
16

17

18

19

20   COURT REPORTER:   Kelly A. McKee, CCR, RMR, CCP, RDR
                       United States Court Reporter
21                     P. O. Box 8552
                       Savannah, GA  31412
22                     912-650-4065

23

24      (Proceedings recorded via electronic recording, transcript
     subsequently produced by computer-aided transcription.)
25
```

2

1                     APPEARANCES OF COUNSEL

2    FOR THE UNITED STATES OF AMERICA:

3        FRANK MORGAN PENNINGTON, II, Esq.
         U. S. ATTORNEY'S OFFICE
4        P. O. Box 8970
         22 Barnard Street, Suite 300
5        Savannah, GA  31412
         912-652-4422
6        Email:  frank.pennington@usdoj.gov

7    FOR THE DEFENDANT:

8        ANDRAYA MIMMS, Esq.
         AM Legal
9        P. O. Box 753
         Bloomingdale, GA  31302
10       912-661-0600
         Email:  AMimms@MimmsMediation.com
11

12

13                      I N D E X

14                                              PAGE

15   DEFENDANT'S WITNESSES

16     JEROME HARRIS
           Direct Examination by Ms. Mimms        33
17         Cross-Examination by Mr. Pennington     36
           Redirect Examination by Ms. Mimms       41
18
     CERTIFICATE OF REPORTER                       53
19

20

21                      E X H I B I T S

22   GOVERNMENT'S EXHIBITS      DESCRIPTION      I.D.'d    ADMITTED

23    No. 1    Collection of photographs          7          7

24

25

3

**P R O C E E D I N G S**

**(11:07 a.m.)**

1
2
3      THE COURT:  All right.  Good morning, everyone.

4      MR. PENNINGTON:  Good morning, Your Honor.

5      THE COURT:  Ms. Davenport, if you would, please call the

6  case.

7      THE CLERK:  *United States of America vs. Lamar Harris*.

8      MR. PENNINGTON:  Government is ready, Your Honor.

9      THE COURT:  Mr. Pennington and Mr. Abrams for the

10  government.

11      MS. MIMMS:  Good morning, Your Honor.  Andraya Mimms on

12  behalf of Lamar Harris.  We are ready as well.

13      THE COURT:  Thank you.  You all may be seated.

14      MS. MIMMS:  Thank you.

15      THE COURT:  All right.  Mr. Harris made his initial

16  appearance and had his arraignment before the Court two days

17  ago, on March the 9th.  At that time, the government indicated

18  that it was moving for detention in this case.  There was a

19  request for a continuance, which was granted, and now this

20  hearing on the issue of detention versus bond has been reset for

21  this morning.

22      Mr. Pennington, would this be a case to which the

23  rebuttal presumption in favor of detention would apply?

24      MR. PENNINGTON:  It is, Your Honor.

25      THE COURT:  Is that at a minimum related to the charge

4

1   in the first count?

2        MR. PENNINGTON:  It is, Your Honor, as well as the

3   possession with intent to distribute controlled substance in

4   California.

5        THE COURT:  Thank you, Mr. Pennington.

6        Ms. Mimms, in light of the fact that this is a

7   rebuttable presumption case in which the presumption in favor of

8   detention attaches, the initial burden of production and

9   persuasion rests with the defendant to at least come forward

10  with sufficient evidence to overcome that presumption.

11  Overcoming the presumption is not a particularly high burden.

12  It can often be accomplished by proffer, generally involving

13  evidence related to ties to the community, lack of criminal

14  history, other factors that you think might bear on that

15  question.

16       So, procedurally, I'm going to need to hear from you

17  first to see if that presumption can be overcome.  If it cannot,

18  that will be the end of this analysis.  If it can be overcome,

19  then the burden will shift back to the government, and I'll hear

20  from Mr. Pennington on his primary burden on his motion.

21       Ms. Mimms, then, I will hear from you first, please.

22       MS. MIMMS:  Thank you, Your Honor.  I would like to

23  begin with a proffer.  Your Honor, I also do have some

24  witnesses, if necessary, if Your Honor would like to examine any

25  of them.

5

1          But I will start by saying, Your Honor, that Mr. Lamar

2     Harris was born in the State of New York, but his family moved

3     to Savannah, Georgia, when Mr. Harris was probably in the second

4     grade, Your Honor.  So since the second grade he has lived in

5     Savannah.  He has numerous family members that are here in

6     Savannah, including his mother, his father, a stepmother, two

7     sisters, a plethora of nieces and nephews.

8          Your Honor, he also is a father-to-be.  His fiancée, or

9     soon-to-be fiancée, is expecting currently with a due date of

10    September 2021.  Of course, she very much would like for

11    Mr. Harris to be released on bond, with conditions if necessary,

12    Your Honor, so that he may be there throughout the pregnancy and

13    hopefully for the birth of his child.

14          Prior to his surrender, Your Honor, Mr. Harris was

15    employed with a staffing company called TeamWRX Staffing.  I

16    personally spoke with Ms. Brendi, B-r-e-n-d-i, King, and she is

17    in the human resources department of TeamWRX Staffing Company.

18    I spoke with her on yesterday, and she also sent me an e-mail

19    this morning verifying that, indeed, Mr. Harris is eligible to

20    be re-employed in the event that he is released.

21          In furtherance of that, Your Honor, his family members,

22    particularly one of his sisters, Tyesha Brunson, who is also

23    present if Your Honor would like more information, they have

24    also identified a GED program for Mr. Harris so that in the

25    event that he is released, he will immediately begin working on

6

1   his GED.

2        THE COURT:  Let me interrupt you, Ms. Mimms.

3        MS. MIMMS:  Yes, Your Honor.

4        THE COURT:  In light of the entirety of the proffer,

5   including the relative youth of the defendant, the absence, at

6   least to my knowledge, of any prior convictions, the combination

7   of his longtime ties to the community, including family and

8   potential employment, I do find that there is sufficient

9   evidence to at least rebut the presumption in favor of

10  detention.

11       MS. MIMMS:  Thank you.

12       THE COURT:  So you may be seated, Ms. Mimms.

13       MS. MIMMS:  Thank you, Your Honor.

14       THE COURT:  The burden now shifts to the Government to

15  proceed on its motion for detention.  Mr. Pennington, are you

16  proceeding on a risk of flight, dangerousness, or both?

17       MR. PENNINGTON:  Your Honor, a limited argument with

18  regard to risk of flight, just our inability to locate him.

19  Predominantly we'd be relying on dangerousness based on the

20  facts and circumstances in the case, not on the history of

21  conduct or anything.

22       THE COURT:  Very well.  I just need to know what to

23  consider.

24       MR. PENNINGTON:  Sure, absolutely.

25       THE COURT:  Mr. Pennington, you may proceed with

7

1    witnesses, evidence, proffer or whatever you wish.

2         MR. PENNINGTON:  Your Honor, I think given COVID

3    restrictions on witnesses and things like that, the defendant

4    and I intended to produce most of our evidence by proffer today.

5         I will say before I begin a discussion of the proffer,

6    that we did provide to the Court what we've marked as

7    Government's Exhibit No. 1, which is really a collection of

8    photographs and items which sort of illustrate the argument

9    today.

10        I conferred with defense counsel prior to court,

11   provided defense counsel with those items as well as an

12   affidavit, which I'll refer a bit to during argument, which make

13   up the basis for some of our argument for detention.

14        So I'd move that Government's Exhibit No. 1 be moved

15   into evidence by a stipulation of the parties.

16        MS. MIMMS:  No objection, Your Honor.

17        THE COURT:  Very well.  Government's Exhibit No. 1,

18   which is a composite exhibit of multiple pages, is admitted

19   without objection.

20        MR. PENNINGTON:  Before I get to the substantive

21   argument, Your Honor, I just want to point out one thing with

22   regard to the PSR on Page 3.  There's an arrest listed there

23   July 30th of 2020.

24        THE COURT:  You mean the bail report, Mr. Pennington?

25        MR. PENNINGTON:  Did I say that?  I'm sorry.

8

1        MS. MIMMS:  You did.

2        MR. PENNINGTON:  My apologies, the bail report.

3    Thinking and not thinking, I guess.  The bail report, Your

4    Honor, on Page 3 lists a date of arrest of July 30th, 2020,

5    involving several charges centering on this possession of what

6    was a short-barreled dangerous weapon, what was categorized as a

7    dangerous weapon in those reports.

8        The disposition is listed as dismissed.  I spoke with

9    probation and defense counsel about this.  We did follow up with

10   the district attorney's office.  It does appear that some of

11   those charges are still pending.  They were transferred to state

12   court because of there being a technicality with the way this

13   particular firearm is designed.  It didn't have a stock, and

14   therefore, was not designed to have been fired from the

15   shoulder.  So that obviously led to a change in the charges.

16       But just a point of clarification, nothing more, is that

17   there are still misdemeanor charges pending with regard to that

18   case.

19       THE COURT:  Which remain undisposed.

20       MR. PENNINGTON:  Which remain undisposed of.  It's just

21   that I will refer to those charges generally as part of the

22   proffer.  So I wanted the Court just to be aware they are still

23   pending, not having been dismissed.

24       Looking at this particular defendant, Your Honor, with

25   regards to the proffer and this defendant's role in this

9

1    conspiracy, I'd remind the Court that the Government initially

2    brought a complaint for this defendant and several others before

3    the indictment that is at issue in this particular case.

4          I say that, Your Honor, to point out that, as part of

5    that complaint, we obviously filed an affidavit that contained

6    information which outlined some of the facts and circumstances

7    around this defendant.

8          THE COURT:  Mr. Pennington, could you wait one moment?

9          MR. PENNINGTON:  Yes.

10         THE COURT:  Ms. Mimms, I'm sorry, you're interrupting me

11   with that conversation.  I cannot hear Mr. Pennington.

12         MS. MIMMS:  I apologize, Your Honor.

13         THE COURT:  Please continue, Mr. Pennington.

14         MR. PENNINGTON:  I'll try to speak a little louder, Your

15   Honor.  Perhaps this mask isn't as easy to talk in as others.

16         So we, as I said, we filed a complaint.  As part of that

17   complaint, we did file an affidavit, which is, of course, part

18   of the record.  I did ensure that Ms. Mimms had a copy of that

19   complaint today.

20         So the Court may to some extent be familiar with the

21   facts and circumstances revolving particularly around Mr. Harris

22   and those other individuals who were particularly involved with

23   Kashif Collins as part of this drug trafficking organization.

24   When I talk about Kashif Collins, Your Honor, I'm talking about

25   the actions which were occurring initially at a location on

1  Bolton Street, 1021 East Bolton Street, and then moving to a

2  later location where -- excuse me.  And other locations.

3          But on 1021 East Bolton Street, Your Honor, this makes

4  up the substance of the charge for Count 24.  On that date, a

5  search warrant was conducted wherein a little over two grams of

6  crack cocaine, over two pounds of marijuana, Oxycodone, and

7  about 1.2 kilograms of cocaine were seized by agents.

8          This drug trafficking organization involving Mr. Harris,

9  the investigation shows, involved the trafficking of ounce

10  quantities of marijuana and kilo quantities of cocaine, sort of

11  at the top by Roberto Collins and then filtered down through

12  these various trap houses there on Bolton Street we identified

13  through this investigation.

14          Mr. Harris is one of the predominant individuals in this

15  investigation as it relates to maintaining the trap houses and

16  as it relates to the distribution and possession of firearms and

17  other narcotics, in this particular case.  So we wanted to make

18  sure that we went through that carefully with Your Honor so we

19  could talk about that.

20          So in the affidavit we presented to Your Honor, and as

21  part of the proffer, we point out, that beginning in November of

22  2019, agents in this case saw Instagram records beginning in

23  that time period, November of 2019.  In reviewing those records,

24  they were able to determine that there were numerous videos

25  posted by -- and photos posted by Mr. Harris and Yusef Scott in

11

1   particular, regarding this drug trafficking organization,

2   wherein they and others were showcasing firearms, including

3   high-caliber AK-47s and AR-15-style firearms, and they were

4   doing that in conjunction with flashing money and marijuana.

5       So a majority of these photos were, in fact, uploaded by

6   Mr. Harris or Mr. Scott and were taken at the initial trap

7   house.  I think I said 1021 East Bolton earlier, and I misspoke.

8   It's 1218 East Bolton Street.  So investigators recognized that

9   because of their previous involvement with this investigation.

10  Really, this is the subject matter in the beginning of the

11  collection of photographs that we're talking about.

12      If you'll flip, Your Honor, to the very first photograph

13  there, you can see a photograph that depicts five young men, and

14  you can see on the left there a firearm in the hand.  We're

15  talking another AR-15 or AK-47-type firearm being held there.

16  In the background, there's an individual sort of standing up

17  high, holding the firearm and then another young man with a red

18  hat.  Behind there, there's a young man with a bucket-style cap

19  and longer hair who is smoking what appears to be marijuana.

20  That's the defendant in this case, Mr. Harris.

21      Now, looking at this, obviously Mr. Harris went by the

22  handle Foolie Fam.  Bolton St Self is Yusef Scott, an indicted

23  co-defendant.  So you can see the defendant here, again,

24  associating with marijuana.  These are all individuals who have

25  been identified as co-conspirators in this particular

12

1  investigation.

2         Turning to the second page, Your Honor, this is a

3  collection of information that was taken from conversations on

4  Instagram documenting Mr. Harris negotiating $800 for four zips,

5  four ounces of marijuana, and then asking them -- and then

6  talking about meeting at a location on East Bolton Street.

7         Again, on December 16th of 2019, there's a message from

8  Foolie, Mr. Harris, that he's got a zip of gas for 160; a zip

9  being an ounce; a gas, a reference to marijuana; and 160 being a

10 reference to the price, which we found during the investigation

11 was consistent with the price of marijuana.

12        Then, once again, another conversation with an

13 individual about a zip or ounce.

14        Turning to the next page, Your Honor -- and this is a

15 big concern with us with regard to Mr. Harris.  It's not just

16 the distribution of marijuana and other controlled substances,

17 as detailed by the investigation, but given this particular

18 section of this drug trafficking organization's proclivity for

19 the use of firearms.

20        I remind the Court that part of the reason why we did

21 the complaint early on with regard to Mr. Harris and others is

22 that we got credible information that there was a threat made

23 upon a police officer with regard to potential violence in this

24 case and that in the course of this investigation, Yusef Scott

25 was observed firing a weapon at a passing vehicle at the trap

13

1   house at 1218 East Bolton Street, which the investigation

2   revealed he and Mr. Harris were living at and running,

3   essentially, the trap house on a daily basis.

4           So turning to this next collection of photographs, the

5   other concern that we have as it relates particularly to

6   Mr. Harris and his involvement with the 924(o) conspiracy to

7   possess, brandish firearms as it relates to this drug

8   trafficking organization is that we were able to establish

9   through the investigation that this defendant not only possessed

10   firearms, but he offered for sale and trade firearms as part of

11   the investigation.

12           You can see here in December of 2018, Mr. Harris --

13   excuse me -- posted a firearm.  But then in January of 2020, you

14   can see that Mr. Harris messaged about the trade of two

15   firearms.  Again, on that same date, an additional one, you can

16   see post that he made on January the 18th.  On January the 28th,

17   various firearms.

18           Then turning to the third page past there, Your Honor,

19   in February of 2020 -- this is of particular concern to the

20   Government -- Your Honor, I know it's sort of going through this

21   quickly, and you're looking at various firearms and various

22   times and dates.  These are not the only photographs or pictures

23   or references we found.

24           THE COURT:  Mr. Pennington, we're going to go as fast or

25   slow as you want to go.  So take your time.

14

1          MR. PENNINGTON:  I understand that.  I'm just letting

2     you know that, with regard to the exhibits that we've selected

3     and we're putting before the Court, this is just an example of

4     the type of activity that Mr. Harris was conducting.

5          So you can see here the conversation regarding, I need

6     some 9 shells, and there's a conversation regarding a Taurus G3

7     that Mr. Harris asked to trade for a Taurus .40 caliber.  The

8     interesting part of this conversation is the notation that this

9     individual, eastsavannahturk, says he'll buy it and says, "my S

10    is legit," meaning that his firearm is legitimate.

11         Mr. Harris responded on that date that his were not

12    legitimate.  So he's trading in firearms, but he's also trading

13    in firearms that he knows he's illegally possessing, that are

14    illegal in and of themselves either, because they're stolen or

15    improperly possessed.

16         Turning to the next page, Your Honor, some additional

17    examples of these firearms that Mr. Harris, fooliefam6, is

18    hanging on to.  You can kind of just continue through here, Your

19    Honor.  The rest of these are really meant to show you his, over

20    the course of time, consistent posting and boasting regarding

21    his possession of firearms.  And, also, it associates him to

22    gang activity or other concerns that we have with regard to this

23    particular one.

24         So if you look at, on the two pages later, Your Honor,

25    there's a photograph that's marked 10:33 p.m.  It has the word

15

1  savage in the lower left-hand corner, and you can see the

2  defendant making a sign with his fingers.  This appears to be a

3  gang sign.  He's got a firearm on his belt.  And a savage is

4  something that is routinely posted by individuals who are either

5  representing themselves as violent or participants in gang

6  activity as a means to show people that they're willing to use

7  violence in order to protect themselves, those who associate

8  with them, and whatever drug trafficking activity they may be up

9  to.  So that's a concern for the Government.

10        You can also notice down at the bottom, Your Honor, it

11  says "liked by 914sheef."  That's Kashif Collins, one of the

12  principal co-defendants in this particular case, a kilo-level

13  distributor of cocaine that the Court has already had before

14  him.

15        Turning to the next page, Your Honor, we see, again, a

16  depiction of Mr. Harris, fooliefam6, a photograph of him with a

17  long gun in his right hand and what appears to be a marijuana

18  joint, or a blunt, in his left hand.  Again, the association

19  here of Mr. Harris with guns and drugs.

20        Turning to the next page, marked at 10:48 p.m., we see,

21  again, him with individuals associated to the DTO with gang

22  signs and marijuana.

23        The next picture, Your Honor, is an example of the type

24  of drug photographs we've seen on Instagram from Mr. Harris

25  posting the availability to these various kinds of marijuana.

16

1   You can see down there, Your Honor, there's a gas pump, a

2   reference to gas, a standard reference that they did.  And I'd

3   also note, Your Honor, as part of the investigation, as part of

4   our affidavit, we did -- and I'll talk a little bit more about

5   it in a minute -- but we did find evidence of Mr. Harris

6   traveling to California and posting regarding his efforts to

7   find marijuana at that location.

8        Turning to the next page, this, again, shows his

9   association with Bolton St Self, or Yusef, and you can see it

10  appears there's a marijuana blunt being rolled by Bolton St

11  Self, or Yusef Scott.

12       Once again, turning to the next page, March 23rd of

13  2019, the defendant, Mr. Harris, with a long gun and also

14  another individual with a handgun.  Again, an example of the

15  types of posts that we were seeing.

16       Turning to the next set of pages, Your Honor, these are

17  really notations regarding Instagram communications again.

18  Again, on February of 2020, a request, "You got some gas?"  And

19  Mr. Harris letting him know, yes, I have the gas and Liyah is on

20  the way there, meaning that's a reference to this marijuana we

21  talked about.

22       Then the last page, Your Honor, this is a conversation

23  that was captured on Instagram between Yusef Scott, who is a

24  co-defendant of Mr. Harris's, and he's having a conversation

25  with an unidentified third party regarding this transition from

1   the initial trap house to 1021 East Bolton Street.  The

2   important thing about this, Your Honor, is that, as we looked at

3   this case, as we proceeded through the case, initially we were

4   able to confirm that Mr. Harris and Yusef Scott had been living

5   at 1218 East Bolton Street.  They were seen there at all hours

6   of the day and night.  They were observed there many times

7   during physical surveillance as well as electronic surveillance,

8   utilizing a fixed platform surveillance device.  And they were

9   seen there at all times of the day or night.

10          Then they were there -- and Mr. Scott in particular was

11  observed on numerous occasions -- conducting what appeared to be

12  hand-to-hand transactions, that is, movements and actions

13  consistent with the sale of narcotics at 1218 Bolton Street.  It

14  was noted that it was a high-traffic narcotics location.  We're

15  not talking occasional sales.  We're talking regular sales

16  throughout the days, throughout the time period that they were

17  there.

18          Again, we go through, and during that time period is

19  when we're seeing some of what we've shown you today, these

20  Instagram messages regarding the sale of zips, the discussion of

21  prices, and that sort of thing that we've shown you here today.

22  Then, also, Your Honor, during that same time period in January

23  of 2020, Your Honor might recall is when there was a reported CI

24  buy conducted with Kashif Collins wherein a quarter kilo of

25  cocaine was purchased from Kashif Collins, and it was noted that

1   he was in possession of at least four kilos of cocaine on that

2   particular date.

3          Why that matters is, although that purchase occurred

4   across the street from 1218 East Bolton Street with Mr. Collins,

5   initially when the confidential informant approached

6   Mr. Collins, he was referred to go across the street to 1218

7   East Bolton Street where Mr. Harris and Mr. Scott and others

8   associated to the DTO had been actively conducting drug

9   transactions.

10          So, moving on, sort of getting to that, then there's

11   this transition from what was initially the stash house to the

12   new drug trafficking location, the new stash house at 1021 East

13   Bolton Street.  We would eventually search and locate these

14   numerous controlled substances as well as four firearms.

15          What's important about that is there was a period of

16   time where they were evicted from 1218 East Bolton, so the

17   activity was sort of down.  Agents weren't sure where they were

18   or where the activity was occurring.  So when this information

19   was received from Instagram, what this showed is there was

20   activity wherein there were discussions about Mr. Scott,

21   Mr. Harris and others attempting to find this new location.

22          And the reason why we've chosen this particular message,

23   Your Honor, is because what it goes to show is Mr. Harris's

24   ongoing role as part of the drug trafficking organization.  It

25   says, that's we've got to get a spot ASAP.  Everybody's not

19

1    coming to this one.  It's supposed to be me, 2 times, and YB

2    gonna to be running this one, of course, cuz gonna be in and

3    out.

4        The real reference, Your Honor, is they were discussing

5    losing money, and then he says, we've got to get a spot ASAP.

6    It's going to be me, meaning Yusef Scott, 2 times and YB gonna

7    be running this one.

8        Mr. Harris and Mr. Scott had been routinely seen at the

9    original trap, and now that it was moving, this is a reference

10   to a continuation of Mr. Scott, 2 times, and YB, who the

11   investigation reveals is an AKA for Lamar Harris, that they're

12   going to be now running the new spot, which would eventually be

13   identified as 1021 East Bolton Street.

14       So agents did identify that location.  They did conduct

15   extended surveillance at that location; and during that

16   extended surveillance, they, again, established that Mr. Harris

17   and Mr. Jones appeared to be residing at 1021 East Bolton

18   Street, Apartment B, that is, they were there at all times of

19   the day or night, and there appeared to be significant drug

20   activity occurring in and around that location.

21       It's during this time period in August of 2020 that

22   there was an indication from Harris via text message that he

23   was in Los Angeles, California, and then there was activity in

24   the investigation where it appeared that he was posting

25   information about marijuana and other things.

1          So then, obviously, in September of 2020, the search

2    warrant was conducted.  And although Mr. Harris, I believe, was

3    not present at that -- on that particular day at that time,

4    officers did seize almost three grams of crack cocaine, a

5    little over two pounds of marijuana, Oxycodone pills, which

6    other members of the DTO had posted conversations concerning

7    the sale of pills, and, again, what is now about 1.2 kilograms

8    of powder cocaine, as well as digital scales, plastic baggies,

9    and a number of firearms.

10         So the Government views this defendant as a leader or

11   organizer, at the very least, with regard to this particular

12   drug trafficking organization, which we think is important for

13   the Court to consider as it considers whether or not he ought

14   to be granted a bond in this case.

15         But we are particularly concerned, Your Honor, with not

16   only his involvement with the sale of marijuana or distribution

17   of marijuana, cocaine, and those things, but his significant

18   involvement with firearms, both as a means to brandish and sort

19   of just show himself out there as a person who's willing to

20   possess and use firearms as part of this drug trafficking

21   organization, but about the way that he sort of, without much

22   concern, was trading and selling firearms that he openly

23   admitted were not legitimate firearms, that were illegally

24   possessed by him and/or by others.

25         So, Your Honor, given that, given the concerns over

21

1    violence in general surrounding a very close compatriot of his

2    in the drug trafficking organization, Yusef Scott, as well as

3    our concerns with violence in general on this particular group

4    within this drug trafficking organization, we did move for

5    detention in the case.

6           If for some reason Your Honor, despite this, does feel

7    compelled to grant the defendant a bond in this case, we'd like

8    to be heard a little bit more on the amount and that type of

9    thing.

10          But, Your Honor, on the first instance, we believe

11   that, based on the factors the Court is to consider, the

12   defendant ought to be denied a bond.  Again, we think that,

13   when you look at the nature and circumstances of these charged

14   offenses, we have the full range.  We have a 924(o) conspiracy,

15   which is illustrated by his possessing, trading firearms, his

16   brandishing those firearms on Instagram, his representing

17   himself and others as part of this 914 group, as savages and

18   that sort of thing.

19          We have the conspiracy to possess and distribute large

20   amounts of drugs in this case, not just marijuana, but cocaine,

21   Oxycodone pills, and other things.  We have his possession of

22   firearms himself, and we have what, I think, speaks to this

23   defendant's role, maintaining a premises for the purpose of

24   this distribution.

25          We can see in these Instagram communications that he

1    and Yusef Scott and others worked together to have a house in

2    the community here in Savannah for the sole purpose of

3    distributing these drugs and making money on behalf of the drug

4    trafficking organization.

5           The weight of the evidence is strong against this

6    defendant given the significant social media contact and other

7    evidence that we've got in the case.  We recognize that, when

8    we look at the history and characteristics of the defendant, it

9    might be easy to say that there's not much there, he doesn't

10   have much of a history.  I'd point out, Your Honor, with regard

11   to that arrest in July, this is another incident where the

12   defendant was in possession of an AR-style firearm.

13          Now, it may not have neatly fit the definition, as the

14   district attorney's office looked at it for a felony, but it

15   was an AR-style firearm, and the defendant was on that date in

16   the presence of Barshalai Jones and other co-defendants which

17   are charged in this particular indictment as well as part of

18   the drug trafficking organization, and he was in possession of

19   firearms and drugs again, which further suggests that, while he

20   may not have been convicted of a crime in this case, he's been

21   for quite a while involved significantly in the possession of

22   guns illegally and in the distribution and possession of

23   illegal controlled substances.

24          So at the end of the day, you should consider he was on

25   bond for those charges, misdemeanors or felonies.  He was on

1    bond for those charges, at least during a portion of this

2    incident.  When we look at he was arrested and bonded in July,

3    his activity continued at least into September when this search

4    warrant was executed there at Bolton Street.

5            So at the end of the day, Your Honor, looking at this

6    particular defendant, we believe that he presents a serious

7    danger to the community through the distribution of drugs, a

8    serious danger to himself through his use of drugs, and a

9    danger to the community because of his significant lifestyle

10   choice to be involved in the use, possession, sale, trade of

11   firearms as well.

12           With regard to the defendant's flight, as I said, not

13   the major argument, but I would point out to the Court that

14   part of the reason that he was not arrested as part of the

15   takedown, why he was not located, is that as far as agents

16   could tell following the takedown there at the Bolton Street

17   address, the search warrant, there was no solid or significant

18   address the defendant was staying at.

19           I know it's represented in the bond report, the bail

20   report, that he had indicated he was living with his father.

21   My understanding is that contact was made with the family and

22   that the information they were given by family was that they

23   could not help them find him.  That is what it is.  I don't

24   know if it's just in that instance he was either not staying

25   there or folks were not being willing to let us know where he

1    was so that he could be found.

2         On the other side of that, he did turn himself in

3    eventually.  So that's where we are with regard to that.

4         Those are really the arguments that the Government

5    would like to make with regards to this defendant.

6         Again, we do urge the Court to consider detaining the

7    defendant based on the whole picture of this particular case.

8    If the Court is going to consider a bond and not order the

9    defendant be detained, we would just like to be heard very

10   briefly on the issue of the amount of bond and whether or not

11   some sort of surety ought to be required.

12        THE COURT:  Thank you, Mr. Pennington.  I do have a

13   couple of questions for you.

14        MR. PENNINGTON:  Sure.

15        THE COURT:  Does any of the Government's evidence point

16   to or suggest any specific overt acts of violence by this

17   defendant?

18        MR. PENNINGTON:  In terms of do we have him, such as

19   Yusef Scott, firing the weapon?  We do not.  We do not.  We

20   simply have, again, this sort of repeated, constant possession

21   of firearms.

22        THE COURT:  And then my second question is more general,

23   Mr. Pennington.  It goes to the collection of photographs that

24   are set forth in Government's Exhibit 1, the composite exhibit.

25   How does the Government characterize -- or what does the

25

1    Government characterize the purpose of these postings to be?

2         MR. PENNINGTON:  You mean by the defendant, what do we

3    characterize the purpose of them?

4         THE COURT:  At all.  These postings, these photos being

5    taken and put on social media in general, what purpose do they

6    serve, in the Government's view?

7         MR. PENNINGTON:  It's hard to say in the context of

8    what's in the defendant's mind.  I obviously can't get in there.

9    I can tell you that it seems to me that it has a dual purpose

10   of, on the one hand, showing that he is -- he has firearms.

11   He's got the ability to use them, if necessary, to do the sort

12   of thing that would be required to protect his family, his 914

13   group, and others if anybody came at him, based on posts like

14   savage and essentially saying things like they're ready.

15        But, also, Your Honor, I think, as it relates to this

16   defendant, Instagram provided a particular platform wherein he

17   could not only advertise and showcase he and his friends'

18   ability to possess firearms, do drugs, have money, live that

19   life, but also they used it as a way to communicate with others

20   about their ability to sell those items, to make themselves more

21   accessible in a way that perhaps they thought was less likely to

22   get them overseen by police, right?  So you can go out on the

23   street and say I got marijuana, or you can post it in a way that

24   is on social media and therefore perhaps more insulated.

25        After all, most of this we had to get by utilizing

1    search warrants so that we could get into those conversations

2    and things that were perhaps a little further offline than just

3    being able to find a public profile, although many of these

4    items were also available through public searches, which is why

5    I think, in this particular case, it's got the dual role of

6    saying I'm ready, I have guns, and I'm willing to use them, and

7    also the secondary purpose, or maybe even primary purpose, of

8    representing themselves as drug dealers and then being able to

9    reach clientele through that platform.

10           THE COURT:  Well, the last portion of that answer sort

11   of gets to the more fine-tuned piece of my question.  I'm trying

12   to decide how much of this is essentially an aggressive

13   marketing campaign, for lack of a better term, versus youthful

14   braggadocio, showing off.

15           MR. PENNINGTON:  I'll say, Your Honor, to the

16   Government's mind, it makes no difference because the difference

17   between braggadocio and actual violence is pulling a trigger.

18   And what we clearly have in this case is the person that

19   Mr. Harris operated a trap house with on a daily basis, right,

20   that he and Mr. Scott, who -- I mean, in that Instagram

21   conversation, clearly it was going to be their job.  They were

22   the ones there every day.  They were the ones maintaining that

23   house.  Guns coming in and out of that house all the time.  We

24   know that Mr. Scott pulled the trigger.  We know through the

25   course of the investigation that there were numerous, numerous

1    shots fired callouts, evidence of shots fired on the ground.

2          Now, can I tell you specifically that Mr. Harris pulled

3    those triggers?  I can't.  But what I can tell you is that we

4    know that Mr. Scott pulled the trigger on at least one occasion

5    because we have those photographs.  We know that there were

6    shootings in and around that area.  I think, if I called the

7    agents, they could tell you that the incidents of shots fired in

8    and around Bolton Street area went down significantly after the

9    takedown on Bolton Street.

10         This was a particular group of individuals who there was

11   significant concern around firearms and violence.  So at the end

12   of the day, it might have been braggadocio when they put it up,

13   but these are not guys who the government thinks weren't willing

14   to back it up if it was necessary.

15         THE COURT:  Thank you, Mr. Pennington.  I appreciate it.

16         Ms. Mimms, I'll hear from the defense, please.

17         MS. MIMMS:  Thank you very much, Your Honor.

18         What we've heard, what I've heard, Judge Ray, is a lot

19   of what appears to be, not what actually is.  It's what appears

20   to be.

21         One thing that I can tell you, Your Honor, that is

22   absolutely for sure, that at the time, the time frame in which

23   we're talking, which would be 2019 and 2020, my client was 18

24   and 19 years old.  So when you talk about youthful braggadocio,

25   we are also talking about just ignorance.  His name was Foolie,

1    and that certainly tells me an 18-year-old kid certainly was not

2    the leader, and that's extremely important to focus on.

3         What we do know for sure, not what appears to be, is

4    that we know for sure Mr. Harris did not pull the trigger.

5    Unfortunately, he was associated with some pretty bad actors.

6    Part of why we are here, Your Honor, is for me to show the Court

7    that he will be removed from those bad actors.

8         Not only does the bail report recommend that Mr. Harris

9    be given a $15,000 unsecured bond with various conditions, one

10   of the conditions, of course, is not having a gun, avoiding all

11   contact with co-defendants, victims, et cetera, Your Honor.  But

12   what we have here today, and I can show by witness, he will be

13   living on New York Avenue under the roof of his father and of

14   his stepmother.

15        What I can also show Your Honor by way of witness, if

16   Your Honor would like to hear from them, would be other family

17   members -- his biological mother, Your Honor, his sister, his

18   girlfriend, who is expecting, as well as the girlfriend's

19   mother -- are all here and would testify to the Court that they

20   will make sure that he stays at home, Your Honor, outside of

21   being able to go to work.

22        We collectively wanted to show Your Honor that he will

23   not pose a danger to the community and that he will be under the

24   watchful eye of several different people.  His father will be

25   able to make sure that there are no guns in the house.  His

1  father will be able to make sure that there are no drugs in the

2  house, Your Honor.

3       It is very helpful with the bail recommendation by

4  probation that they have done their independent viewing of the

5  case, and this is what they came up with, Your Honor.

6       In terms of some of these postings, Your Honor, were not

7  even directly from Mr. Harris, but from those folks that he

8  associated with.  So you did not hear specifically that

9  everything contained in here is by or from Mr. Harris.  It was

10 always, well, Mr. Harris along with, in conjunction with.

11      Even if we talk about what's legit and what's not legit,

12 it's somebody else characterizing that conversation.  Even if we

13 go to the last message on 2/28 that Yusef Scott, he was the one

14 who made a posting, not my client.  And it should not be held

15 against my client that he's a danger to the community based on

16 Scott's actions.

17      We are here not to prove or disprove the case today,

18 Your Honor, but simply to show you how Mr. Harris would not be a

19 danger to the community nor to any person.  And with the love

20 and very, very close supervision by his family members, he will

21 not be such a danger.

22      Something else, Your Honor, although my pen just -- so

23 please forgive me here.  Something else, Your Honor, that is

24 extremely notable that has changed is the fact that now my

25 client is aware he is a father-to-be.  That is life changing.

1    It is so life changing that he has made a commitment to his

2    girlfriend.  He is making a commitment to get his GED in order

3    to better himself.  I have followed up on his prospective

4    employment, again to verify as an officer of this court that he

5    will be employed.  He will be a productive citizen, if indeed,

6    Your Honor, he is released on detention.

7           Something else, Your Honor, that I do want to point out

8    to the Court, yes, indeed, he was arrested in, I believe it was

9    July of 2020, July 30th of 2020.  The only charges that are

10   pending, Your Honor -- and I, too, spoke directly with the

11   assistant district attorney who will be handling this.  The

12   accusation hasn't even been written at this time, Your Honor.

13   The only pending charges, per my conversation, in state court is

14   loitering and prowling, criminal trespass, and obstruction.

15   There were no drug charges.  Initially there was a gun charge,

16   but that was dismissed fairly early on.  So he's not facing

17   that.  He's facing three misdemeanor charges that an accusation

18   hasn't even been drafted.  That was in July, Your Honor.

19          Something else that is extremely notable, this young man

20   surrendered himself.  So you've got someone who is willing to

21   address all of the charges against him with his eyes open and

22   make himself present and available to the Court as well as

23   making sure that he is going to do the right thing upon his

24   release, Your Honor.

25          My client -- and I'm laughing not as -- not in jest to

31

1    the Court, but he just turned 20 years old, and I told him he

2    hasn't even been 20 years old for an entire month.  I'm sorry

3    that he's in the position that he's in, but, thankfully, he is

4    young enough that a young dog can learn really good new tricks,

5    and a young dog is able to do that in this case, Your Honor.  He

6    is able to turn things around.  It is early enough for him.

7         And he would like the opportunity to show the Court that

8    he is willing and able and ready to do the right thing upon his

9    release by getting his GED, by working, by being supportive to

10   his girlfriend.

11        And, Your Honor, just as an additional information, I

12   did share with the girlfriend myself, along with the

13   girlfriend's mother, I don't want my client at her house.  I

14   want my client to remain on New York Avenue with his father,

15   with his stepmother, outside of going to and from work and

16   outside of going to and from GED classes, which may have to be

17   done in person versus doing it on Zoom, Your Honor.

18        But his movements will be able to be verified.  If an

19   electronic monitor needs to be installed in order to verify

20   that, then he's certainly willing to do that.  And the reason

21   that I said, Your Honor, that I didn't even want him so much at

22   his girlfriend's house is because I don't want him to be

23   involved in any situation that could potentially be dangerous to

24   him and jeopardize his freedom, Your Honor.

25        And I will expand that to one last one, in terms of

32

1  going to and from doctors' appointments regarding his

2  child-to-be, Your Honor.  But, again, even if there were

3  electronic monitoring, that could be verified.  If he had to

4  notify probation when the appointments are and what his

5  movements are, he is willing to do that, Your Honor.

6          With that, Your Honor, I do believe that we are able to

7  show you, or that we have shown you, that my client is not a

8  danger to the community.  He will not be in the presence of

9  anyone or any of the other 28 co-defendants, Your Honor.  We

10 heard the other day that there may be additional arrests that

11 are made.  I have instructed him -- not even this Court, but I

12 have instructed him there's to be contact with nobody except for

13 the known people that we've got here today, Your Honor.

14         THE COURT:  Ms. Mimms, Mr. Harris's father, would that

15 be Mr. Jerome Harris?

16         MS. MIMMS:  Yes, Your Honor.

17         THE COURT:  I think I'd like to hear some testimony from

18 Mr. Jerome Harris, if you would not mind presenting him.

19         MS. MIMMS:  Yes, thank you.  Your Honor, may I ask

20 Ms. Davenport if she has another pen?  This is the only one

21 that I had, and I may need to take notes.

22         THE COURT:  Ms. Davenport, can we loan Ms. Mimms a pen?

23         MS. MIMMS:  Thank you very much.

24         THE COURT:  Mr. Harris, would you come on in, please.

25         MS. MIMMS:  Good morning, Mr. Harris.

1    THE COURT:  Could you walk on up here?  Before you sit

2    down, turn around, raise your right hand, face the clerk, and

3    she'll administer you an oath.

4    THE CLERK:  Do you solemnly swear or affirm the

5    testimony you give in this case will be the truth, the whole

6    truth, and nothing but the truth, so help you God?

7    THE WITNESS:  Yes, ma'am.

8    THE CLERK:  Could you please state your name and spell

9    it for the record.

10    THE WITNESS:  Jerome Harris, J-e-r-o-m-e H-a-r-r-i-s.

11    THE CLERK:  Thank you.

12    THE COURT:  You can have a seat there, Mr. Harris,

13    please.  Mr. Harris, if you'd lean towards the microphone just

14    to make sure we get you.

15    Ms. Mimms, you may proceed.

16    MS. MIMMS:  Thank you very much.

17                   JEROME HARRIS, being first duly sworn,

18    testified as follows:

19                        DIRECT EXAMINATION

20    BY MS. MIMMS:

21    Q.    Mr. Harris, how are you -- do you know Lamar Harris?

22    A.    Yes, it's my son.

23    Q.    Thank you very much.  Mr. Harris, I'm not going to ask too

24    many blunt questions here.  Let me just kind of get down to the

25    nitty gritty here.  Please state your address.

34

1    A.    2316 New York Avenue, Savannah, Georgia, 31404.

2    Q.    Who lives at that address with you, sir?

3    A.    My wife, Patricia; my mother, Cora; and I'm raising two

4    grandkids.

5    Q.    Okay.  And is there room for Lamar Harris to live there?

6    A.    Yes, there is.

7    Q.    Does your wife, Patricia Harris, is she employed outside

8    of the home, sir?

9    A.    No, she isn't.

10   Q.    Okay.  Would she be available to keep an eye on Lamar at

11   times that you personally are not at home?

12   A.    Yes, they have a good relationship.

13   Q.    Okay.  And, Mr. Harris, are you employed, sir?

14   A.    Yes, I am.

15   Q.    And where are you employed?

16   A.    Moran Environmental Recovery.  I'm a truck driver for

17   them.

18   Q.    Thank you, sir.  How long have you been employed there?

19   A.    It will make four years May.

20   Q.    Okay.  And did you and I previously discuss that, if Judge

21   Ray were to allow a bond for Mr. Harris, that Mr. Harris would

22   have to stay in your home?

23   A.    Yes, ma'am.

24   Q.    Did we previously discuss that Mr. Harris should only

25   leave the home for employment?

35

1    A.    Yes, ma'am.

2    Q.    Did we also discuss that, besides employment, he could

3    only leave the home for GED classes?

4    A.    Yes, ma'am.

5    Q.    And the last thing, are you aware that Mr. Harris is

6    expecting a child?

7    A.    Yes, ma'am.

8    Q.    Did we also discuss that he would be able to leave the

9    home simply to accompany Ms. Owen to and from doctors'

10   appointments?

11   A.    Yes, ma'am.

12   Q.    Did we also discuss that, in furtherance of his

13   relationship with Ms. Owen, that she would need to come and

14   visit him in your house?

15   A.    Yes, ma'am.

16   Q.    Okay.  Did we also discuss, Mr. Harris, that his mother,

17   Ms. Shepherd, would also make sure that Mr. Harris is doing the

18   right thing?

19   A.    Yes, we did.

20   Q.    And we also discussed that she could only visit at your

21   home; is that right?

22   A.    Yes, ma'am.

23   Q.    Did we also discuss that Ms. Tyesha Brunson, his older

24   sister, that she would also be keeping an eye on Mr. Harris?

25   A.    Yes, ma'am.

36

1   Q.   And that she would do so from your home; is that correct?

2   A.   Yes, ma'am.

3   Q.   All right.  And did we also discuss that Ms. Smashum,

4   Ms. Owen Smashum, who is the mother of Taisha, his girlfriend,

5   that she would also participate in any oversight or supervision

6   of Lamar Harris?

7   A.   Yes, we did.

8   Q.   Okay.  Did we also discuss, sir, that Mr. Harris is able

9   to be re-employed with the prior staffing agency, TeamWRX

10  Staffing?

11  A.   Yes, ma'am.

12  Q.   Okay.  And, Mr. Harris, this is extremely important.  Are

13  you, as the head of the household, able to ensure that

14  Mr. Harris will not have any guns of any sort?

15  A.   Yes, ma'am.

16  Q.   Okay.  Mr. Harris, as head of the household, are you able

17  to ensure that Mr. Harris will not have any access or possess or

18  participate in any drug use?

19  A.   Yes, ma'am.

20  Q.   All right, sir.  With that, Judge Ray may have questions

21  or Mr. Pennington, on behalf of the Government, may have

22  questions for you, sir.

23          THE COURT:  Mr. Pennington, any cross-examination?

24          MR. PENNINGTON:  Thank you, Your Honor.

25                          CROSS-EXAMINATION

37

BY MR. PENNINGTON:

Q.   Where was your son living in September of last year?

A.   With me.

Q.   He was living with you?

A.   Yes, sir.

Q.   So where was he in October of last year?

A.   With me.

Q.   In December of last year, was he living with you also?

A.   December -- uh, yeah, as a 19-year-old, he comes and goes.

Q.   So he says he's living with you, he has a bed there?

A.   Yes, he does.

Q.   But he's not staying there every day?

A.   Not every day, no.

Q.   Is he staying there -- how frequently?  One or two times a week?

A.   You know, my opinion like that, he's a 19-year-old boy.

Q.   So up until now, you have not monitored his coming and going; is that right?

A.   Yes, sir.

Q.   And although he was living with you, sounds like he wasn't staying there all that frequently; is that right?

A.   I see him from time to time.  You know, I'm not actually counting how many days I see him, how many days I don't see him.

Q.   So let's talk about December of last year.  Do you remember on or around December the 10th of last year, that

38

1   police came to the house looking for your son?

2   A.   Yes, sir.

3   Q.   All right.  And, in fact, it was the SWAT team and a whole

4   group of officers; is that right?

5   A.   Yes, sir.

6   Q.   And was your son there on that day?

7   A.   No, he wasn't.

8   Q.   Had he been there that day at all up until -- it was real

9   early in the morning; right?

10  A.   Yeah, about ten minutes to 6:00.

11  Q.   All right.  Had he been there the evening before?

12  A.   I have to tell you the truth, I don't know.  His room is

13  in the back.  If he came in and didn't knock on my room door,

14  I --

15  Q.   You say his room is in the back.  Is it in a separate part

16  of the house?  Does he have his own entrance?

17  A.   No, no, it's in the back of the house.

18  Q.   Okay.  And so would he have had to walk by or pass your

19  room in order to get in or out?

20  A.   Actually, we have two sides to his room.  One through the

21  hallway and one through the dining room, kitchen, then his room

22  in the back.

23  Q.   So he could access the room without you knowing, he could

24  leave without you knowing, he could leave that house; is that

25  right?

39

1   A.    Yes, he could.

2   Q.    And he could come back to the house without you knowing?

3   A.    Yes, he could.

4   Q.    Okay.  And so on this December the 10th, he wasn't there;

5   is that right?

6   A.    No, he wasn't.

7   Q.    Did you look for him on that day?  When they came to the

8   house.

9   A.    No, I'm not looking for him, no.

10  Q.    Did the police ask you to look for him that day?

11  A.    No.  They asked me was he here?  I looked in the back, and

12  I said, no, he isn't here.

13  Q.    Did you know where he was?

14  A.    No, I don't.  No, I didn't.

15  Q.    When did he come back to your house?  Was he living with

16  you after that day?

17  A.    He hadn't been back to the house.

18  Q.    He hadn't been back to the house at all that day.

19  A.    No.

20  Q.    Did you talk to him that day?

21  A.    No, I didn't.

22  Q.    Have you talked to him since?

23  A.    Yes.

24  Q.    Do you talk to him regularly?

25  A.    I used to.

40

```
1    Q.    Used to when?

2    A.    Before this incident.

3    Q.    Okay.  So before -- when you say this incident, what do

4    you mean?  Before the police came to your house in December?

5    A.    Before they came to look for him, yes.

6    Q.    And you haven't talked to him much since?

7    A.    Yes, because he didn't have a phone.

8    Q.    Did you tell him the police came to your house?

9    A.    When I talked to him, yes.

10   Q.    Did you tell him the police were looking for him?

11   A.    Yes.

12   Q.    And you told him -- how quickly did you tell him in

13   December?

14   A.    I told -- say what?

15   Q.    How quickly did you tell him -- I'm sorry.  These masks

16   are a pain, I know.  How quickly did you tell him after December

17   the 10th that the police were looking for him?

18   A.    What do you mean how quickly?

19   Q.    Did you talk to him on December the 11th?  Did you talk to

20   him a week later or a month later?

21   A.    I'm not a hundred percent sure.

22   Q.    If you had to guess, within a week or within a month?

23   A.    I'm not a hundred percent sure.

24   Q.    Did he ever come back to your house to stay even one night

25   after December the 10th?
```

41

1   A.    No, he didn't.

2   Q.    Did he ever come to your house to have dinner or

3   otherwise?

4   A.    No, sir.

5   Q.    So up until he turned himself in recently, he hadn't been

6   to your house or hadn't been in contact with you?

7   A.    Right.

8   Q.    Did he ever tell you where he was or what he was doing?

9   A.    No, sir.

10  Q.    But he was very aware at some point, you talked to him,

11  you told him the police came, the police were looking for him,

12  and he needed to do something about it, I'm sure; right?

13  A.    Yes, sir.

14        MR. PENNINGTON:  No further questions, Your Honor.

15        THE COURT:  Thank you, Mr. Pennington.

16        Ms. Mimms, any redirect?

17        MS. MIMMS:  Yes, please.  Thank you, Your Honor.

18                        REDIRECT EXAMINATION

19  BY MS. MIMMS:

20  Q.    Mr. Harris, have you been truthful with the Court today?

21  A.    Yes, ma'am.

22  Q.    Mr. Harris, in the event Judge Ray does allow Mr. Harris

23  to be released on bond, would you be cooperative with probation?

24  A.    Yes, ma'am.

25  Q.    Would you be cooperative with law enforcement?

42

1    A.    Yes, ma'am.

2    Q.    Would you now be able to lay down the law, so to speak, in

3    your own house?

4    A.    Yes, ma'am.

5    Q.    And would you also now be very conscious about knowing

6    your son's whereabouts?

7    A.    Yes, ma'am.

8    Q.    Would you be able to get an alarm system on your door to

9    verify any comings and goings of anyone?

10   A.    We have one.

11   Q.    Okay.  And -- that's all I have, sir.  Thank you very

12   much, Mr. Harris.

13   A.    You're very welcome.

14         THE COURT:  Thank you, Ms. Mimms.

15         Mr. Pennington, any recross?

16         MR. PENNINGTON:  No, Your Honor.  Thank you.

17         THE COURT:  Mr. Harris, I'm trying to decide if I'm

18   going to ask you any questions.  Bear with me just one moment,

19   sir.

20         THE WITNESS:  No problem.

21         THE COURT:  Mr. Harris, Ms. Mimms asked you a series of

22   questions about did you talk about this, did you talk about

23   that?  She asked you probably 15 or 20 questions like that.  Do

24   you recall that?

25         THE WITNESS:  Yes, sir.

43

1          THE COURT:  And they included topics like did you talk

2    about he would live with you, that you would be responsible?

3    What I want to ask you is did you agree with all of those topics

4    that she put to you?

5          THE WITNESS:  Yes, sir.

6          THE COURT:  You're agreeable to having your son stay in

7    your house?

8          THE WITNESS:  Yes, sir.

9          THE COURT:  Are you particularly familiar with what in

10   specific he's been charged with here in this court?

11         THE WITNESS:  Somewhat, but I don't 100 percent know the

12   law, so you know.

13         THE COURT:  You would be comfortable with him remaining

14   in your home going forward?

15         THE WITNESS:  Yes, sir.

16         THE COURT:  How would you guarantee that he would have

17   no access to drugs?

18         THE WITNESS:  Well, my wife is always there, and my

19   mother's always there.  So when I'm not there, they would be

20   there.

21         THE COURT:  Did your son spend his whole life growing up

22   in your house, or did he grow up with his mother?

23         THE WITNESS:  Back and forth.

24         THE COURT:  How much of his childhood --

25         THE WITNESS:  As he got older, he came to stay with me.

44

1        THE COURT:  At what age did he first come to stay with

2   you?  Roughly.  Doesn't have to be precise.

3        THE WITNESS:  He's 20.  He moved back in '08.

4        THE COURT:  Was he a teenager yet?

5        THE WITNESS:  Not quite.

6        THE COURT:  Not yet a teenager?

7        THE WITNESS:  No, sir.

8        THE COURT:  Did you have any disciplinary problems

9   controlling him at all when he was a teenager?

10        THE WITNESS:  No, hunh-uh.

11        THE COURT:  How far did he go in school?  Do you know?

12        THE WITNESS:  The ninth grade.

13        THE COURT:  You described his comings and goings as an

14   18- and 19-year-old.  Did he have comings and goings as a

15   teenager in your house, too, a younger teenager?

16        THE WITNESS:  No, not after I got him from his mom.

17        THE COURT:  Do you have any firearms in your house, sir?

18        THE WITNESS:  Yes, sir.

19        THE COURT:  What kind of firearms do you have?

20        THE WITNESS:  A pistol.

21        THE COURT:  Is that for your own protection?

22        THE WITNESS:  Yes, sir.  I have a license also.

23        THE COURT:  Officer McDaniel, we typically require

24   anyone in the home to get rid of all firearms if someone lives

25   there?

45

1        USPO McDANIEL:  Yes, Your Honor.

2        THE COURT:  Would you be willing to part with your

3  pistol or any ammunition for the period of time your son is in

4  your home?

5        THE WITNESS:  Yes, sir.

6        THE COURT:  Put it in another place outside of the home?

7        THE WITNESS:  I surely will.

8        THE COURT:  Counsel, based on the questions I've put to

9  the witness, you all may have some questions.

10        Mr. Pennington, I'll let you go first.

11        MR. PENNINGTON:  I don't have any, Your Honor.  Thank

12  you.

13        THE COURT:  Ms. Mimms?

14        MS. MIMMS:  Your Honor, I don't have any either.  I

15  think he's addressed that appropriately.

16        THE COURT:  Mr. Harris, I thank you for your time.  That

17  concludes your testimony.  You can step down from the witness

18  stand.

19        Mr. Pennington, any objection if Mr. Harris is allowed

20  to remain in the back of the courtroom?

21        MR. PENNINGTON:  Of course not, Your Honor, no.

22        THE COURT:  Mr. Harris, if you'd like to watch the rest

23  of these proceedings, you can sit in the back row if you'd like.

24  Otherwise, you can go back out in the hallway.

25        THE WITNESS:  I'll stay.

46

1          THE COURT:  Ms. Mimms, any additional evidence or

2    witnesses that you would like to present on this topic?

3          MS. MIMMS:  Your Honor, I do believe that, again, if

4    Your Honor would like to hear from others, I have it, but I

5    believe that we can stand on the proffer at this moment, Your

6    Honor, in that we have presented that Mr. Lamar has -- he's not

7    a flight risk, number one, Your Honor.  And we have mitigated

8    any potential danger to the community that Your Honor may have

9    considered in this case.

10          THE COURT:  All right.  Thank you, Ms. Mimms.

11          MS. MIMMS:  Thank you.

12          THE COURT:  I take it, then, defense rests on that

13    point?

14          MS. MIMMS:  Yes, Your Honor.  Thank you.

15          THE COURT:  Officer McDaniel, we have a recommendation

16    from your office in this case for release on conditions.  Is

17    that still the recommendation of your office?

18          USPO McDANIEL:  Yes, Your Honor.

19          THE COURT:  All right.  Thank you, ma'am.

20          The determination of release on conditions versus

21    detention is governed by the Bail Reform Act of 1984, as

22    codified by Title 18 United States Code Section 3142.  The

23    Government has a burden in this case of demonstrating by clear

24    and convincing evidence that there is no condition or

25    combination of conditions that will reasonably assure the safety

47

1   of the community, or in the alternative, or additionally, by a

2   preponderance of the evidence, that there is no condition or

3   combination of conditions that will reasonably assure the

4   appearance of the defendant.

5          This is a case to which the rebuttable presumption in

6   favor of detention applies.  The defendant has successfully

7   rebutted that presumption, but it does not evaporate and

8   disappear.  It is still a factor that the Court is required to

9   consider in rendering its decision in this respect.

10         The factors which govern the Court's determination in

11  this matter are set forth in 18 United States Code Section

12  3142(g).  (G) sub(1) indicates that I'm required to consider the

13  nature and circumstances of the offense charged, and more

14  specifically, whether it involves use of a controlled substance

15  or firearm.  The nature and circumstances of the charged

16  offenses in this case involve both firearms and the potential

17  sale and distribution of controlled substances.

18         Therefore, it would appear that the nature and

19  circumstances of the offense charged would militate in favor of

20  detention in this case.

21         The second factor which the Court is required to

22  consider is the weight of the evidence against the person.  The

23  weight of the evidence against Mr. Harris in this case, to my

24  way of thinking, appears to be fairly strong.  While nothing I

25  say here today in any way abrogates or sets aside the

48

1   presumption of innocence, Mr. Harris is, of course, presumed

2   innocent of these offenses.  Nonetheless, there is significant

3   evidence here that is consistent with the Government's charge

4   and would appear to support the position that the Government has

5   asserted in this case as to Mr. Harris's alleged criminal

6   activity.

7          Therefore, the weight of the evidence in this case is

8   also a factor, which would appear to lean in favor of detention.

9   But I would note that weight of the evidence is one of the less

10  significant factors for the Court's consideration.

11         The third factor that the Court is required to consider

12  includes the history and characteristics of the person,

13  including, among other things, his character, his physical and

14  mental condition, his family ties, his employment, his length of

15  time residing in the community, his community ties, his past

16  conduct, his history of drug or alcohol abuse, any criminal

17  history, and also whether any of the offenses at issue may have

18  taken place during a period of time that he was in a status of

19  release.

20         Taking all of those factors into consideration --

21  actually, I take that back.  It says probation or parole or

22  other release.  Would the Government's position be that the bond

23  qualifies as other release, Mr. Pennington?

24         MR. PENNINGTON:  Yes, Your Honor.

25         THE COURT:  All right.  Just wanted to be sure about

49

1    that.  This factor is the largest factor, and it also contains

2    the largest sub pieces to it, and not surprisingly, it is often

3    the factor that most often cuts in multiple directions depending

4    upon what evidence the Court credits.

5         On the one hand, Mr. Harris has to his credit his

6    relative youth.  He has to his credit a very limited criminal

7    history.  There is at least some pending criminal charge against

8    him in the state system, which is still outstanding, but there

9    are no convictions.  He has a family presence here at the

10   courthouse today.  His father has testified, and I am informed

11   that there were multiple other family members in the hallway

12   also present who could have been available if there were a need

13   to present their testimony and who also presumably support

14   Mr. Harris in connection with this circumstance.

15        On the other hand, I do have some concerns about the

16   fact that Mr. Harris was apparently on bond from this prior

17   charge in the state system during the period of time which is

18   captured by the indictment.  The indictment was returned, to my

19   memory, I think in November of this year, and it recites that

20   the criminal activity is alleged to have continued up through

21   and including the return date of the indictment itself.

22   Therefore, the bond would have been present and in place.  This

23   suggests perhaps an unwillingness or inability of Mr. Harris to

24   follow instruction.

25        Much of Ms. Mimms' very good presentation and able

50

1   argument is premised upon the appropriateness of placing

2   Mr. Harris in his father's home as a condition, a lynchpin

3   condition essentially, designed to guarantee his conduct.  I

4   have some misgivings as to whether I am necessarily persuaded

5   that Mr. Jerome Harris, the father, whose testimony I give full

6   credit and weight to, necessarily has the degree of control over

7   his son that can assure me reasonably that he will not continue

8   to engage in this kind of conduct.

9          All of which is to say that the third factor is probably

10  neutral when all is said and done because there are matters that

11  cut both ways.

12         The fourth factor, then, concerns the nature and

13  seriousness of the danger to any person or the community that

14  would be posed by the person's release.

15         I am deeply troubled by this compendium of photographs

16  that is contained in Government's Exhibit No. 1.  It is hard to

17  know, in looking at this, how much of it is youthful bragging

18  and how much of it is a serious commitment to threats of

19  violence, to the use of firearms, to engagement in the drug

20  trade.  But I don't only have the photographs, I also have some

21  of the text messaging that points to Mr. Harris's involvement in

22  this alleged drug trafficking organization, perhaps at a level

23  higher than his relative youth might suggest.

24         Ms. Mimms rightly points out, and I probably agree, he's

25  not the mastermind of this alleged organization.  But I don't

51

1    know that he's a boy scout or a mere foot soldier either, and

2    that's the rub in this circumstance.

3         The Bail Reform Act clearly prefers release on

4    conditions when the Court can craft a set of conditions that

5    gives it reasonable assurance that the defendant will not be a

6    risk to the community.  I am not persuaded that the Government

7    has carried its burden on the risk of flight problem.  This

8    gentleman has ties to the community.  He has family.  He did

9    turn himself in even if he may have made some effort at avoiding

10   capture.  I cannot say he would flee prosecution.  So that's not

11   the issue.

12        The sole remaining issue, then, is am I persuaded that I

13   can craft a set of conditions that will allow the community to

14   be safe?

15        It is the considered opinion of the Court that I cannot.

16   I believe that the Government has sustained its burden in

17   demonstrating to me that there is no condition or combination of

18   conditions that will reasonably assure the safety of the

19   community in this particular case.

20        I will note that I am often fully persuaded by a

21   criminal history as absent as Mr. Harris's that I can accomplish

22   this, but the totality of the evidence proffered by the

23   Government, it gets the ball across the line, albeit barely.

24        Therefore, it is the determination of this Court that

25   Mr. Harris is going to be remanded to the custody of the United

52

1    States Marshal Service pending his next appearance in this

2    court.  I will prepare a written detention order in detail after

3    I have an opportunity to leave the bench.

4           Mr. Pennington, are there any additional matters on

5    behalf of the government in this case this afternoon?

6           MR. PENNINGTON:  No, Your Honor, thank you.

7           THE COURT:  Ms. Mimms, any additional matters on behalf

8    of Mr. Harris?

9           MS. MIMMS:  No, Your Honor, just besides expressing

10   disappointment.

11          THE COURT:  Understood.  Mr. Pennington, Ms. Mimms,

12   Mr. Harris, everyone please stay safe and stay healthy.  This

13   concludes this hearing.  We stand in recess.

14                  (Proceedings concluded at 12:20 p.m.)

15                            - - -

16

17

18

19

20

21

22

23

24

25

53

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Kelly A. McKee, Registered Diplomate Reporter,

4   Register Merit Reporter and Certified Realtime Reporter, in and

5   for the United States District Court for the Southern District

6   of Georgia, do hereby certify that pursuant to Section 753,

7   Title 28, United States Code, that the foregoing is a true and

8   correct transcript of the electronically recorded proceedings

9   held in the above-entitled matter and that the transcript

10  subsequently transcribed by me is true and accurate to the best

11  of my ability to hear and understand the recording, and the

12  page format is in conformance with the regulations of the

13  Judicial Conference of the United States.

14

15          Dated this 3rd day of December, 2021.

16

17

18          /s/ Kelly A. McKee

19          KELLY A. McKEE, CCR, RMR, RDR, CCP

20

21

22

23

24

25